**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

DONNELL WOLFE,                  :
                               :  Civil Action No. 10-2083 (PGS)
        Plaintiff,             :
                               :
                               :
        v.                     :  **OPINION**
                               :
CHRIS CHRISTIE, et al.,        :
                               :
        Defendants.            :

**APPEARANCES:**

    DONNELL WOLFE, Plaintiff <u>pro</u> <u>se</u>
    NRU/STU #000064
    30-35 Hackensack Avenue, P.O. Box 699
    Kearny, New Jersey 07032

**SHERIDAN**, District Judge

    Plaintiff, Donnell Wolfe, an involuntarily committed person

pursuant to the Sexually Violent Predator Act ("SVPA"), <u>N.J.S.A.</u>

30:4-27.24, <u>et</u> <u>seq.</u>, seeks to bring this action <u>in</u> <u>forma</u>

<u>pauperis</u>.  Based on his affidavit of indigence, the Court will

grant plaintiff's application to proceed <u>in</u> <u>forma</u> <u>pauperis</u>

("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the

Clerk of the Court to file the Complaint.

    At this time, the Court must review the Complaint, pursuant

to 28 U.S.C. § 1915(e)(2), to determine whether it should be

dismissed as frivolous or malicious, for failure to state a claim

upon which relief may be granted, or because it seeks monetary

relief from a defendant who is immune from such relief.  For the

reasons set forth below, the Court concludes that the Complaint should be dismissed without prejudice at this time.

## I.   <u>BACKGROUND</u>

Plaintiff, Donnell Wolfe ("Wolfe"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Chris Christie, the Governor of New Jersey; Paula Dow, Attorney General for the State of New Jersey; Gary Lanigan, Commissioner of the New Jersey Department of Corrections ("NJDOC"); Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("NJDHS"); Steven Johnson, NJDOC Administrator; and Merril Main, NJDHS Administrator. (Complaint, Caption and ¶¶ 4b-4g). The following factual allegations are taken from the Complaint, and are accepted as true for purposes of this screening only. The Court has made no findings as to the veracity of plaintiff's allegations.

Wolfe alleges that, on March 23, 2010, SCO Hyatt informed plaintiff that the NJDOC was changing the name of East Jersey State Prison ("EJSP") because the residents at the Northern Regional Unit ("NRU") in Kearny, New Jersey were going to be transferred to the EJSP. Wolfe also alleges that, on April 7, 2010, he was informed by a NJDHS staff member that he was going to be transferred to the administrative segregation unit at EJSP, and once there, the phones will be turned off with no contact with family members, no visits, recreation and treatment for a

month or more.  Wolfe complains that he will be confined to a cell like a prisoner.  (Compl., Statement of Claims, ¶ 6).

On April 9, 2010, Administrator C. Conway informed plaintiff that the transfer to EJSP would start around May 1, 2010 by the NJDOC Central Transport.  On April 10, 2010, Sgt. Smith told the residents that they would have to throw away three-quarters of their personal belongings to facilitate the move to the EJSP "ad seg" building.  (Id.).

On April 14, 2010, Chief Buchannan at the Kearny facility told the residents that they have to pack their own property and load it on the moving truck.  Buchannan also told the residents that there would be drug dogs at the EJSP "ad seg" unit to sniff the personal property for contraband (cell phones and drugs) when the residents arrived, pursuant to NJDOC prison guidelines.  Also on April 14, 2010, Merril Main told the residents that treatment (therapy), yard/recreation, visits, etc., would be on "stand still" for a month or more until the NJDOC and NJDHS figured out how to run the programs at EJSP.  (Id.).

Wolfe asks that he be provided with "the proper treatment of a federally funded facility."  He also seeks an unspecified amount in compensatory damages for the mental anguish and stress that he is suffering in being transferred to a prison facility. (Compl., ¶ 7).

## II.   <u>STANDARDS FOR A SUA SPONTE DISMISSAL</u>

A district court is required to review a complaint in a civil action where the litigant is proceeding <u>in forma pauperis</u>. Specifically, the court is required to identify cognizable claims and to <u>sua sponte</u> dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Wolfe is proceeding <u>in forma pauperis</u> in this matter, this action is subject to <u>sua sponte</u> screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a <u>pro se</u> complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (2007)(following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) and <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972)).  <u>See also</u> <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a <u>pro se</u> plaintiff's "bald assertions" or "legal conclusions."  <u>Id.</u>

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights.  Id.  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief."
Fed.R.Civ.P. 8(a)(2).[1]  Citing its recent opinion in Bell
Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the
proposition that "[a] pleading that offers 'labels and
conclusions' or 'a formulaic recitation of the elements of a
cause of action will not do,' "Iqbal, 129 S.Ct. at 1949 (quoting
Twombly, 550 U.S. at 555), the Supreme Court identified two
working principles underlying the failure to state a claim
standard:

>     First, the tenet that a court must accept as true all of the
>     allegations contained in a complaint is inapplicable to
>     legal conclusions.  Threadbare recitals of the elements of a
>     cause of action, supported by mere conclusory statements, do
>     not suffice ... .  Rule 8 ... does not unlock the doors of
>     discovery for a plaintiff armed with nothing more than
>     conclusions.  Second, only a complaint that states a
>     plausible claim for relief survives a motion to dismiss.
>     Determining whether a complaint states a plausible claim for
>     relief will ... be a context-specific task that requires the
>     reviewing court to draw on its judicial experience and
>     common sense.  But where the well-pleaded facts do not
>     permit the court to infer more than the mere possibility of
>     misconduct, the complaint has alleged-but it has not
>     "show[n]"-"that the pleader is entitled to relief."  Fed.
>     Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

>     a court considering a motion to dismiss can choose to begin
>     by identifying pleadings that, because they are no more than
>     conclusions, are not entitled to the assumption of truth.
>     While legal conclusions can provide the framework of a
>     complaint, they must be supported by factual allegations.
>     When there are well-pleaded factual allegations, a court

---

[1]  Rule 8(d)(1) provides that "[e]ach allegation must be
simple, concise, and direct.  No technical form is required."
Fed.R.Civ.P. 8(d).

6

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1948.  The Supreme Court's ruling in Iqbal emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible.  Id. at 1949-50; see also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, 578 F.3d 203, 210(3d Cir. 2009).

This Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89 (2007).  Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).

### III.  SECTION 1983 ACTIONS

Wolfe brings this action pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

7

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. _West v. Atkins_, 487 U.S. 42, 48 (1988); _Piecknick v. Pennsylvania_, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

## IV.   THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT

The New Jersey SVPA, _N.J.S.A._ 30:4-27.24 _et seq._, provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP"). _N.J.S.A._ 30:4-27.26.  The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, _N.J.S.A._ 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment.  _N.J.S.A._ 30:4-27.34(b). The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in consultation with of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and

8

specific characteristics of, and treatment protocols related to, sexually violent predators." N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs. N.J.S.A. 30:4-27.25. The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed. Id. The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings. N.J.S.A. 30:4-27.35. A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge. N.J.S.A. 30:4-27.36.

V.   ANALYSIS

A.   Transfer to Prison Facility Claim

The principal claim asserted in Wolfe's Complaint is that his transfer to a prison facility, as a civilly committed person under the SVPA, is unconstitutional. Wolfe seeks to prevent his transfer accordingly.

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme
Court of the United States examined the conditions of confinement
provided by Kansas' Sexually Violent Predator Act.  The Act
called for the confinement of sexually violent predators in a
secure facility because they were dangerous to the community.
Id., 521 U.S. at 363-64.  Pertinent here, the Supreme Court was
aware that the sexually violent predators in Kansas were to be
held in a segregated unit within the prison system.  However, the
Court noted that the conditions within the unit were essentially
the same as conditions for other involuntarily committed persons
in mental hospitals.  Moreover, confinement under the Act was not
necessarily indefinite in duration, and the Act provided for
treatment.  Id., 521 U.S. at 363, 364, 365-368.  Thus, the
Supreme Court held that involuntary confinement under Kansas'
SVPA was not unconstitutional so long as such civilly-confined
persons are segregated from the general prison population and
afforded the same status as others who have been civilly
committed.  Id., 521 U.S. at 368-69.  See also Seling v. Young,
531 U.S. 250, 261062 (2001)(holding same with respect to the
State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the
Kansas and Washington SVP statutes that were examined and upheld
as constitutional by the Supreme Court in Hendricks and Seling,

respectively.[2]  See Bagarozy v. Goodwin, Civil Action No. 08-468
(SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re
Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002).
Therefore, this Court finds that Wolfe's transfer, with the SVP
residents of the Kearny facility, to a segregated unit in the
East Jersey State Prison does not, in and of itself, violate the
U.S. Constitution's Due Process Clause.  Moreover, because the
transfer has now been effected, plaintiff's claim for injunctive
relief to prevent the transfer to EJSP is now rendered moot.
Accordingly, the claim that plaintiff's transfer to a segregated
unit within a prison facility is unconstitutional will be
dismissed for failure to state a cognizable claim of a
constitutional deprivation.

B.  Conditions of Confinement Claim

        Although plaintiff's transfer to a segregated unit within a
prison facility is not, in and of itself, a constitutional
violation, Wolfe makes additional allegations concerning the
conditions of confinement at the EJSP facility.  For instance, he
complains that he will be housed in a 23-hour lock-down facility.
However, Wolfe also states that Mr. Main had told the residents

---

        [2]  Recently, the Supreme Court held constitutional under the
Necessary and Proper Clause, a federal statute that allowed a
district court to order the civil commitment of a sexually
dangerous federal prisoner beyond the date the prisoner would
otherwise be released.  United States v. Comstock, No. 08-1224,
__ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these
civilly committed persons remained confined at a federal prison,
namely, FCI Butner, the Court did not address their place of
civil confinement as being unconstitutional.

that there would be a period of time needed to resolve issues of recreation and yard time, and to renovate the space to make suitable living quarters for the civilly committed residents. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[3] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22. Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307. The Constitution is not concerned with de minimis restrictions on patients' liberties. Id. at 320. Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." Seling, 531 U.S.

---

[3]   In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose. 441 U.S. 520, 535-39, (1979).

at 265.  While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Wolfe's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a 23-hour lock down facility.  This restriction also involves limited recreation yard time and visitation.  However, Wolfe acknowledges in his Complaint that these conditions are merely temporary until the "Ad Seg Unit" is renovated for the SVP residents.  At most, the administrators told plaintiff and the other SVP residents that it would take a month or two to complete renovations to accommodate the less restrictive and treatment-oriented environment suitable for civilly committed SVPs.

Moreover, even if plaintiff has temporary restrictions in yard activity and mobility throughout the facility, the Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme.  See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[4] to segregated confinement of

_____

    [4]  In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint

13

civilly committed SVPs).  See also Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise extending Sandin to civil commitment settings).  As stated above, Wolfe's complaints about the restrictions on his confinement are minimal and clearly temporary.  Consequently, this Court finds that Wolfe has failed to state a cognizable claim in this regard at this time, and the alleged conditions of confinement claim will be dismissed without prejudice.[5]  To the extent that Wolfe can allege facts to show that unconstitutional conditions of confinement have continued for a longer period of time than suggested by the NJDHS and NJDOC administrators, Wolfe may seek leave to re-open this case and file an amended pleading.[6]

---

in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

    [5]  Wolfe makes a bald allegation that he was told there was no circulating air, cold showers, leaking roof, and roach infested buildings at EJSP.  (Compl., ¶ 4f).  However, these allegations are merely speculative.  At the time that plaintiff filed his Complaint, he had not yet been transferred to EJSP.  Therefore, should these alleged conditions exist after Wolfe is transferred to EJSP, then Wolfe can re-open his case and amend his Complaint with new allegations concerning the conditions of his confinement.

    [6]  Should plaintiff so choose to amend his Complaint to cure the deficiencies noted herein, pursuant to Federal Rule of Civil Procedure 15, Wolfe should note that when an amended complaint is filed, the original complaint no longer performs any function in the case and "cannot be utilized to cure defects in the amended [complaint], unless the relevant portion is specifically incorporated in the new [complaint]."  6 Wright, Miller & Kane, Federal Practice and Procedure § 1476 (2d ed. 1990) (footnotes omitted).  An amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular allegations to be adopted must be clear and

C.   Interference with the Mail Claim

Wolfe next appears to assert that the delivery of his mail to the Annex, rather than directly to him at EJSP, violates his First Amendment rights.  Specifically, in ¶ 4g of his Complaint, Wolfe alleges that he will not receive mail or packages at EJSP.

Inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments.  Jones v. Brown, 461 F.3d 353, 358 (3d Cir. 2006), cert. denied, 549 U.S. 1286 (2007).[7] However, an inmate's constitutional right to send and receive mail may be restricted for legitimate penological interests.  See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner, the Supreme Court of the United States found that a prison regulation infringing on an

---

explicit.  Id.  To avoid confusion, the safer course is to file an amended complaint that is complete in itself.  Id

[7]   In Jones v. Brown, the United States Court of Appeals for the Third Circuit held that the legal mail policy of state prison in opening legal mail outside the presence of the inmate violated the inmate's First Amendment right to freedom of speech, and was not reasonably related to prison's legitimate penological interest in protecting health and safety of prisoners and staff. 461 F.3d at 358.  The Third Circuit also has held that "a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech.  Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court."  Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir. 1995) (applying the Turner analysis), implied overruling on other grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997).  Thus, the assertion that legal mail is intentionally opened and read, delayed for an inordinate period of time, or stolen may state a First Amendment claim.  See, e.g., Antonelli v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v. Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest.  <u>Id</u>. at 89.  The Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights.  <u>Turner</u>, 482 U.S. at 89-91.  The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.  <u>Id</u>.

The Third Circuit has applied <u>Turner</u> in analyzing constitutional claims by civilly committed SVPs.  <u>See</u> <u>Rivera v. Rogers</u>, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. March 29, 2007)(applying <u>Turner</u> in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied <u>Turner</u> when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[8]

_____

[8]  Essentially, the First Amendment analysis under <u>Turner</u> mirrors the due process analysis under <u>Youngberg</u>; in both instances, courts must balance the constitutional interests of

16

See Willis v. Smith, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying Turner to SVP claims concerning mail handling procedures); Ivey v. Mooney, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30, 2008)(applying Turner, but noting that a civil confinement is significantly different from a criminal confinement); Francis v. Watson, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing cases that have applied Turner in cases involving civilly confined persons); Marsh v. Liberty Behavioral Health Care, Inc., 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), aff'd 330 Fed. Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

In Rivera, the Third Circuit affirmed the district court's ruling that a facility housing civilly committed SVPs has a legitimate interest in both the safety of its facility and the rehabilitation of its patients.  Rivera, 224 Fed. Appx. at 151 (citing Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999)("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.")).  Specifically, the court upheld as constitutional the STU's policy that allows staff to open

---

confined persons against the legitimate interests of the state-run institution in which they reside.  See Beaulieu v. Ludeman, 2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent with Youngberg because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

packages not marked as "legal mail" to assure that the packages
do not contain contraband (i.e., items either harmful to staff
and residents, or detrimental to rehabilitation).  The court
found that plaintiff was free to send and receive mail so long as
the content of his mail was not sexually explicit.  Moreover, the
Third Circuit found no error in the district court's conclusion
that there were no ready alternatives to mail security and that
the STU's policy appeared to be the only viable alternative, thus
supporting the reasonableness of the mail policy.  Rivera, 224
Fed. Appx. at 151.

     Here, this Court likewise finds that it is beyond dispute
that the staff at EJSP, where plaintiff and other SVP residents
are newly housed, has a legitimate interest in both the safety of
its facility and rehabilitating its patients.  As noted above,
these civilly committed persons are convicted sexual predators,
which makes safety at EJSP a very important concern.  The staff
clearly must determine if any items coming through the mail pose
a threat to the safety of the staff or the other residents.  They
also must decide if any of the materials passing through the mail
could be detrimental to a resident's therapy.  Consequently, as
set forth by the Supreme Court and the Third Circuit, the Court
must defer to the prison officials when it comes to issues of
managing a safe and operational prison facility.  In this case,
delivery of letters and packages at the Avenel facility located
close by, where the staff is trained with respect to SVP issues

unlike the general NJDOC staff at EJSP, assures that harmful materials are not being passed through the mail, but also allows for specialized treatment regarding SVP residents.  This new policy, which appears to be preliminarily instituted because of the recent transfer of the SVP residents to EJSP, clearly bears a rational relationship to both interests discussed above. Moreover, in his interference with the mail claim, Wolfe does not allege a single incident where his mail has not been delivered or received.[9]  Rather, his only complaint seems to be that his mail will be sent to another facility instead of EJSP where he now resides.  Wolfe does not articulate a claim that prison officials are intentionally delaying his mail.  Therefore, the Court will dismiss this claim without prejudice at this time, and allow Wolfe to file an amended pleading, consistent with the pleading requirements of Rule 8(a)(2) and amended pleading requirements of Rule 15 of the Federal Rules of Civil Procedure, as discussed in fn. 10 of this Opinion, <u>supra</u>, if Wolfe in fact wishes to pursue such a claim.

D.   <u>Deprivation of Property Claim</u>

Wolfe also appears to be asserting a claim that he has been, or will be, deprived of his personal property in violation of his constitutional rights.

---

[9]  A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.  <u>Morgan v. Montayne</u>, 516 F.2d 1367 (2d Cir. 1975), <u>cert</u>. <u>denied</u>, 424 U.S. 973 (1976).

The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]"  The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  <u>Zappan v. Pennsylvania Board of Probation and Parole</u>, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard.").  Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process.  <u>See</u> <u>Rusnak v. Williams</u>, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Wolfe must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law.  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972). For present purposes, a procedural due process analysis involves

a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, Wolfe fails to specify what property the NJDOC and NJDHS officials did not permit him to keep.  Moreover, the limitations allegedly placed by NJDOC and NJDHS officials on personal belongings to be moved with the transfer of the residents from the Kearny facility to EJSP were neither arbitrary or capricious, but plainly were implemented in order to address the logistics of the move and to further a legitimate goal of maintaining a safe and organized mass transfer of individuals from one facility to another.  In this regard, Wolfe simply has not demonstrated a constitutionally-recognized property interest in the continued possession of unrestricted personal property necessary to satisfy the threshold requirement of a deprivation of property interest.  See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn. Jan. 8, 2010).

Furthermore, to the extent that Wolfe was deprived of personal property as a result of the transfer to EJSP, he has a post-deprivation remedy.  Property loss caused by the intentional acts of government officials does not give rise to a procedural

21

due process claim under § 1983 where a post-deprivation remedy satisfying minimum procedural due process requirements is available under state law.  See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856.[10]  The New Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government.  See  Holman, 712 F.2d at 857; Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by Wolfe here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

E.   Unlawful Search Claim

Wolfe next alleges that his personal property will be subject to a search for contraband by dogs upon their arrival at

_____

[10]   In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Supreme Court explained, however, that post-deprivation remedies do not satisfy the Due Process Clause if the deprivation of property is accomplished pursuant to established state procedure rather than through random, unauthorized action.  455 U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United States v. James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in "extraordinary situations" such as routine deduction of fees from a prisoner's account even without authorization, post-deprivation remedies may be adequate).

EJSP.  This allegation is purely speculative.  Further, it would appear that plaintiff is asserting that as a civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529.  The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530.  The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure

23

> institutional security and internal order.... [S]ociety
> would insist that the prisoner's expectation of privacy
> always yield to what must be considered the paramount
> interest in institutional security.... [I]t is accepted by
> our society that loss of freedom of choice and privacy are
> inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks
omitted).  The same conclusion was reached with respect to
pretrial detainees other than convicted prisoners.  See Bell v.
Wolfish, 441 U.S. 520, 558-560 (1979)(finding that body cavity
searches of pretrial detainees do not violate the Fourth
Amendment).[11]

Consequently, involuntarily committed patients and SVPs,
like pretrial detainees, are entitled to some protection under
the Fourth Amendment, but they do not have an expectation of
privacy equal to an individual in society generally.  See Serna
v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial
detainees are kept in custody because there is cause to believe
they are dangerous; similarly, commitment under Minnesota law as
a sexually dangerous person requires a finding of dangerousness),

---

[11]   In Bell v. Wolfish, the United States Supreme Court, in
determining the constitutionality of post-visitation body cavity
searches, held that a reasonableness test should be employed when
examining the constitutionality of a search that encroaches upon
the personal privacy of an inmate and the integrity of the
inmate's body.  In other words, courts must balance the need for
the particular search against the invasion of personal rights
that the search entails.  Courts must consider the scope of the
particular intrusion, the manner in which it is conducted, the
justification for initiating it, and the place in which it is
conducted.  441 U.S. 520, 559 (1979); see also Turner v. Safley,
482 U.S. 78 (1987) (a prison regulation which infringes upon an
inmate's constitutionally recognized right is valid only if it is
reasonably related to a legitimate penological interest).

24

cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9ᵗʰ Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. Id.

Here, with respect to his Fourth Amendment claim, Wolfe's primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation. Applying the balancing test employed by Wolfish, this Court finds that the alleged, prospective search of personal property by dogs sniffing for

contraband is plainly reasonable and does not violate Wolfe's Fourth Amendment rights. First, such a search is not highly intrusive and does not involve a physical touching of plaintiff's person. Even if plaintiff were subject to a personal search, the purpose of the search as alleged does not violate the Fourth Amendment. See Semler v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints). See also Serna, 567 F.3d at 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones.)

Moreover, there are no allegations that the prospective search is to be conducted in a menacing manner. See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010). Wolfe admits that the search is a NJDOC policy when persons arrive at a prison facility, thus suggesting that the dog search for contraband is to be conducted for the purpose of prison security and the

effective management of EJSP to contain and prevent contraband
from entering the facility grounds.  Accordingly, this Court will
dismiss Wolfe's Fourth Amendment unlawful search claim at this
time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to
state a cognizable claim under § 1983.  However, this dismissal
is without prejudice to Wolfe seeking to re-open his case with an
amended Complaint alleging additional facts to support an
unlawful search claim.

F.   <u>Interruption of Treatment Claim</u>

       Finally, Wolfe appears to assert that therapy/treatment
sessions will be completely denied because of the transfer to
EJSP.  He contends that he will be denied the right to adequate
treatment and reasonable care applicable to civilly committed
SVPs, in violation of the Fourteenth Amendment.

       The Fourteenth Amendment to the United States Constitution,
§ 1, guarantees that "[n]o State shall ... deprive any person of
life, liberty, or property, without due process of law."  This
due process guarantee has been interpreted to have both
procedural and substantive components, the latter which protects
fundamental rights that are so "implicit in the concept of
ordered liberty" that "neither liberty nor justice would exist if
they were sacrificed."  <u>Palko v. Conn.</u>, 302 U.S. 319, 325 (1937).
These fundamental rights include those guaranteed by the Bill of
Rights, as well as certain liberty and privacy interests
implicitly protected by the Due Process Clause, such as the right

27

to marry.  Washington v. Glucksberg, 521 U.S. 702, 720 (1997).
Substantive due process also protects against government conduct
that is so egregious that it "shocks the conscience," even where
the conduct does not implicate any specific fundamental right.
See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny
and will be upheld if they are "narrowly tailored to serve a
compelling state interest." Reno v. Flores, 507 U.S. 292, 302
(1993).  However, regulations not implicating fundamental rights
(in other words, those claims attacking particularly egregious or
arbitrary governmental actions) are analyzed under the
deferential standard referred to as the rational basis review,
and will generally succeed only if the government action shocks
the conscience.  See Glucksberg, 521 U.S. at 728.

With respect to Wolfe's claim, it appears that he is
asserting that he has a fundamental right to adequate treatment
as a civilly committed sex offender.  The Supreme Court
established that there exists a constitutionally protected right
of mentally retarded persons confined at a state institution to
minimally adequate treatment.  Specifically, the Supreme Court
held that there is a constitutional right of mentally disabled
persons confined at a state institution to "minimally adequate
habilitation", self-care treatment or training to the extent
necessary to protect their recognized fundamental rights to

28

safety and freedom from physical restraints.  Youngberg, 457 U.S.
at 316, 319 and 322.

     The Supreme Court further held that, where a fundamental
right is at issue, a district court must balance "the liberty of
the individual and the demands of an organized society" to
determine whether such right has been violated.  Youngberg, 457
U.S. at 320.  Although restrictions burdening a fundamental right
generally receive strict scrutiny, in Youngberg, the Supreme
Court found that this sort of rigorous analysis would unduly
burden the ability of states, specifically their professional
employees, to administer mental health institutions.  Id. at 322.
Consequently, the Court concluded that "the Constitution only
requires that the courts make certain that professional judgment
was in fact exercised," because "[i]t is not appropriate for the
courts to specify which of several professionally acceptable
choices should have been made."  Id. at 321 (internal quotation
and citation omitted).  Thus, a decision, "if made by a
professional, is presumptively valid; liability may be imposed
only when the decision by the professional is such a substantial
departure from accepted professional judgment, practice, or
standards as to demonstrate that the person responsible actually
did not base the decision on such judgment."  Id. at 323.

     In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United
States Court of Appeals for the Third Circuit held that New
Jersey's unique former statutory scheme for sex offenders that

29

predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of both procedural and substantive due process analyses.  288 F.3d at 545.  Leamer was not a civilly committed sex offender like plaintiff here.  Rather, Leamer was a convicted sex offender whose confinement and treatment were inextricably linked pursuant to statute.  The sentencing court had classified Leamer as having a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point.  Leamer could not reduce his sentence through good behavior credits, parole policies or other credits.  Instead, he could only shorten his incarceration through successful therapy, which was an "inherent and integral element" of the statutory scheme. Consequently, the Third Circuit found that deprivation of treatment would be a grievous loss not emanating from the sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the violation of recognized fundamental rights to safety and freedom from physical restraints, this Court finds the Third Circuit's holding in Leamer to clearly extend to an involuntarily committed sex offender under New Jersey's SVPA.  Like Leamer, the length of Wolfe's confinement under the SVPA is predicated on his response to treatment.  Indeed, the provisions of the SVPA explicitly

recognize New Jersey's obligation to provide treatment to SVPs for their eventual release based on successful therapy.  <u>See</u> <u>N.J.S.A</u>. 30:4-27.32(a)("If the court finds by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall issue an order authorizing the involuntary commitment of the person to a facility designated for the custody, care and ***treatment*** of sexually violent predators")(emphasis added); <u>N.J.S.A</u>. 30:4-34(b)("The Division of Mental Health Services in the Department of Human Services shall provide or arrange for treatment for a person committed pursuant to this act.  Such treatment shall be appropriately tailored to address the specific needs of sexually violent predators."); <u>N.J.S.A.</u> 30:4-27.36(a)(At any time during the involuntary commitment of a person under this act, if the person's treatment team determines that the person's mental condition has so changed that the person is not likely to engage in acts of sexual violence if released, the treatment team shall recommend that the Department of Human Services authorize the person to petition the court for discharge from involuntary commitment status"); <u>see</u> <u>also</u> <u>Kansas v. Hendricks</u>, 521 U.S. 346, 367 (1997)(concluding from similarly-worded provisions of the Kansas SVP Act that "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery ....")(alterations in original)(internal citations omitted).

31

Therefore, based on Youngberg and Leamer, this Court concludes that Wolfe's liberty interest in treatment is fundamental and cognizable for purposes of both procedural and substantive due process analyses.  But see Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted that Youngberg did not establish a right for the civilly committed to treatment per se; the Supreme Court only "held that the Constitution required only such 'minimally adequate training ... as may be reasonable in light of [the] liberty interest[ ] in safety and freedom from unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322). In Bailey, the Eighth Circuit concluded that plaintiff had no right to "psychiatric treatment to overcome a 'sexual offender condition'"  because he "was neither in danger during his civil commitment nor was he subject to any restraints beyond the ordinary incidents of any involuntary confinement." Id. at 1153, 1154.  Citing Bailey, district courts in the Eighth Circuit have since concluded that civilly committed sexual predators have no substantive due process right to mental health treatment, adequate or otherwise.  See Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010)("Because this Court has not recognized a constitutional right to effective 'treatment' in the context of civilly committed sex offenders, Plaintiffs [alleging substantive due process violations through ineffective treatment] have failed to allege a due process claim ....")(citing

Nicolaison v. Ludeman, 2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in ultimately concluding that involuntarily committed sex offender's right to treatment is not "clearly established" for purposes of 28 U.S.C. § 2254(d)(1), that Youngberg "only recognized a right to 'minimally adequate' treatment that reduces the need for restraints," and not a "comparable right to treatment that facilitates release").

Nevertheless, while this Court may recognize that Wolfe has a fundamental and cognizable liberty interest in treatment, based on the allegations and admissions by plaintiff in his Complaint, this Court also determines that there has been no procedural or substantive due process violations at this time.

With respect to Wolfe's right to procedural due process, there does not appear to be any basis to plaintiff's claim that there has been a categorical denial of therapy due to his transfer to EJSP's administrative segregation unit. In Leamer, the Third Circuit, relying on Sandin, found that Leamer would face "significant obstacles" in establishing a procedural due process claim based on his placement on RAP (restricted activities program) status because the mere fact of placement in administrative segregation is not in and of itself enough to implicate a liberty interest.  Leamer, 288 F.3d at 546.  In the instant case, Wolfe will not actually be confined in administrative segregation for the purpose of punishment, but rather, he and the other SVP residents at the Kearny facility

33

will be transferred to a unit at EJSP separate and apart from the convicted prisoners.  Moreover, there is no absolute denial of treatment, only a projected estimation that treatment might be delayed while the transfer takes place and living quarters are made suitable for the residents.

This Court likewise finds no substantive due process violation at this time.  Substantive due process prevents the government from engaging in conduct that "shocks the conscience," or interferes with rights "implicit in the concept of ordered liberty."  Glucksberg, 521 U.S. at 721.  Under this standard, Defendants' actions in denying Wolfe his statutory right to treatment will be found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as to shock the conscience.  See Leamer, 288 F.3d at 546-47 (substantive due process claim alleging inadequate treatment for committed sex offender "must focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release").

Here, despite Wolfe's initial allegation, defendants have not categorically declined to provide any mental health treatment to the SVP residents at EJSP, but only projected a short period for disruption of treatment so as to accomplish the transfer and/or renovation of the segregated unit at EJSP.  Thus, this

34

Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Wolfe's substantive due process rights.  Indeed, plaintiff's allegation before his actual transfer to EJSP is merely speculative and it is not readily apparent that treatment would be disrupted for a significant time.

Thus, the Court concludes that treatment has not been denied to the SVP residents as alleged because there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation.  Any deviation in providing treatment is speculative and merely temporary to accomplish the transfer and renovate the SVP quarters at EJSP. Therefore, this Court concludes that the alleged short-lived disruption of therapy and treatment, if any, has not been shown to be so egregious as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, Wolfe's claim alleging inadequate treatment will be dismissed without prejudice for failure to state a cognizable claim of a deprivation of a constitutional right at this time.

V.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint will be dismissed without prejudice, in its entirety as against all named defendants, for failure to state a claim at this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiff may seek leave to re-open this case to file an amended pleading to cure the deficiencies noted herein.  An appropriate order follows.

<u>*s/Peter G. Sheridan*</u>
PETER G. SHERIDAN, U.S.D.J.

July 19, 201