**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

DONNELL WOLFE,                       :
                                     :  Civil Action No. 10-2083 (PGS)
            Plaintiff,               :
                                     :
                                     :
            v.                       :   **OPINION**
                                     :
JENNIFER VELEZ, et al.,              :
                                     :
            Defendants.              :


**APPEARANCES:**

> DONNELL WOLFE, Plaintiff pro se
> #000064
> East Jersey State Prison, Special Treatment Unit
> CN 905, 8 Production Way
> Avenel, New Jersey 07001

**SHERIDAN,** District Judge

Plaintiff, Donnell Wolfe, an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24, et seq., filed this amended Complaint (Docket entry no. 5), on or about August 24, 2010, after his initial Complaint had been dismissed without prejudice by Opinion dated July 19, 2010 (Docket entry no. 2) and Order filed August 25, 2010 (Docket entry no. 3). At this time, the Court must review the amended Complaint, pursuant to 28 U.S.C. § 1915(e)(2), to determine whether the action should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune

from such relief.  For the reasons set forth below, the Court
concludes that this action should be dismissed for failure to
state a claim.

Additionally, on or about September 30, 2010, plaintiff
filed a motion for a temporary restraining order ("TRO").
(Docket entry no. 8).  Because the amended Complaint will be
dismissed for failure to state a claim, the motion for a TRO is
denied as moot.

## I.  BACKGROUND

Plaintiff, Donnell Wolfe ("Wolfe"), brings this amended
civil rights action, pursuant to 42 U.S.C. § 1983, against the
following defendants: Jennifer Velez, Commissioner of the New
Jersey Department of Human Services ("NJDHS"); Steve Johnson,
Assistant Superintendent at the East Jersey State Prison, Special
Treatment Unit ("EJSP-STU"); Dr. Merril Main, Clinical Director
at EJSP-STU; Kenneth Sharpe, Assistant Attorney General for the
State of New Jersey; John Main, Chief Director of the NJDHS at
the Ann Klein Forensic Center in Trenton, New Jersey; and Debbie
Hasting, New Jersey Department of Corrections ("NJDOC")
Superintendent at the Adult Diagnostic and Treatment Center
("ADTC") in Avenel, New Jersey.  (Complaint, Caption and ¶¶ 4b-
4g).  The following factual allegations are taken from the
Complaint, and are accepted for purposes of this screening only.

The Court has made no findings as to the veracity of plaintiff's allegations.

In his Complaint, Wolfe alleges generally that defendants have either authorized or condoned the New Jersey Department of Corrections to place plaintiff, a civilly committed resident, on prison grounds and under prison policy and guidelines in violation of his constitutional rights. (Compl., ¶¶ 4b-4g). In addition, Wolfe complains that defendant John Main has allowed plaintiff to be housed on prison grounds where the roof leaks, the water is not drinkable, there are loose wires, no air conditioning and some toilets don't work. (Compl., ¶ 4g).

More specifically, Wolfe alleges that, on May 14, 2010, NJDOC Commissioner Gary Lanigan visited the EJSP-STU and stated that he would like to privatize the STU. On May 15, 2010, correctional officers advised plaintiff and other residents that family and friends visiting the residents would not be permitted to bring cell phones, house keys, and purses with them in the EJSP-STU. (Compl., ¶ 6).

Wolfe also complains that, for ten days after arriving at the EJSP-STU in May 2010, the residents were subjected to poor living conditions, including, cold showers, exposed wires, no air conditioning, some inoperable toilets, and contaminated water. Wolfe alleges that defendant Johnson told him that the residents would be given a case of water every month because the water at

3

the EJSP is contaminated, but the water is given to the officers instead.  (Id.).

On June 1, 2010, Johnson told the residents that they would not have access to the EJSP law library.  On June 10, 2010, plaintiff was informed that the residents on the South Unit at the EJSP-STU, where plaintiff is confined, is designated for those residents who have refused therapy and will never be released.  Wolfe also alleges that, on August 12, 2010 he was told that no matter how much therapy he and the other residents on the South Unit receive, they will never be released.  (Id.).

On August 12, 2010, residents on the South Unit were informed that they would receive $60.00 a month, instead of $150.00, because of their treatment refusal status.  Wolfe complains that this constitutes punishment.  (Id.).

Wolfe complains that, as of August 17, 2010, the living conditions are still bad, including cold showers, poor ventilation, contaminated water, and bug infestation.  He also complains that therapy is conducted in "cages" and there is no privacy.  (Id.).

Wolfe asks to be transferred to a federally funded facility and for compensatory and punitive damages.  (Compl., ¶ 7).

On September 30, 2010, the Court received a motion filed by Wolfe seeking a temporary restraining order directing defendants not to retaliate against plaintiff by placing plaintiff on "MAP"

4

(modified activities program) or treatment refusal status.  (See Docket entry no. 8).  Wolfe alleges that he has been banned from law library materials and has been placed under prison policy guidelines and procedures even though he is not a prisoner.  He also alleges that he has been threatened with MAP status if he does not follow the NJDHS "way" and that he has been separated from his "mental support."  He further alleges that he has been denied his recommended treatment because of his placement in a segregated unit with little or no access to a psychiatrist. (Id.).

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a civil action where the litigant is proceeding in forma pauperis. Specifically, the court is required to identify cognizable claims and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Wolfe is proceeding in forma pauperis in this matter, this action is subject to sua sponte screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94

(2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions." Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a complaint is "frivolous" is an objective one. Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim

6

in <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009).  The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights.  <u>Id</u>.  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  <u>Fed.R.Civ.P.</u> 8(a)(2).[1]  Citing its recent opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' "<u>Iqbal</u>, 129 S.Ct. at 1949 (quoting <u>Twombly</u>, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and

---

[1]  Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct.  No technical form is required."  <u>Fed.R.Civ.P.</u> 8(d).

common sense.  But where the well-pleaded facts do not
permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged-but it has not
"show[n]"-"that the pleader is entitled to relief."  <u>Fed.
Rule Civ. Proc.</u> 8(a)(2).

<u>Iqbal</u>, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

> a court considering a motion to dismiss can choose to begin
> by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

<u>Iqbal</u>, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must
now allege "sufficient factual matter" to show that a claim is
facially plausible.  This then "allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged."  <u>Id</u>. at 1948.  The Supreme Court's ruling in
<u>Iqbal</u> emphasizes that a plaintiff must demonstrate that the
allegations of his complaint are plausible.  <u>Id</u>. at 1949-50; <u>see
also</u> <u>Twombly</u>, 505 U.S. at 555, & n.3; <u>Fowler v. UPMC Shadyside</u>,
578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that <u>Iqbal</u> provides
the "final nail-in-the-coffin for the 'no set of facts' standard"
set forth in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957),[2] that

---

[2]   In <u>Conley</u>, as stated above, a district court was
permitted to summarily dismiss a complaint for failure to state a
claim only if "it appear[ed] beyond doubt that the plaintiff can

applied to federal complaints before <u>Twombly</u>.  <u>Fowler</u>, 578 F.3d
at 210.  The Third Circuit now requires that a district court
must conduct the two-part analysis set forth in <u>Iqbal</u> when
presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be
> separated.  The District Court must accept all of the
> complaint's well-pleaded facts as true, but may disregard
> any legal conclusions. [<u>Iqbal</u>, 129 S.Ct. at 1949-50].
> Second, a District Court must then determine whether the
> facts alleged in the complaint are sufficient to show that
> the plaintiff has a "plausible claim for relief." [<u>Id</u>.]  In
> other words, a complaint must do more than allege the
> plaintiff's entitlement to relief.  A complaint has to
> "show" such an entitlement with its facts.  <u>See</u> <u>Phillips</u>,
> 515 F.3d at 234-35.  As the Supreme Court instructed in
> <u>Iqbal</u>, "[w]here the well-pleaded facts do not permit the
> court to infer more than the mere possibility of misconduct,
> the complaint has alleged-but it has not 'show [n]'-'that
> the pleader is entitled to relief.'"  <u>Iqbal</u>, [129 S.Ct. at
> 1949-50].  This "plausibility" determination will be "a
> context-specific task that requires the reviewing court to
> draw on its judicial experience and common sense." <u>Id</u>.

<u>Fowler</u>, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this
<u>pro se</u> pleading must be construed liberally in favor of
Plaintiff, even after <u>Iqbal</u>.  See <u>Erickson v. Pardus</u>, 551 U.S. 89
(2007).  Moreover, a court should not dismiss a complaint with
prejudice for failure to state a claim without granting leave to
amend, unless it finds bad faith, undue delay, prejudice or
futility. See <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 110-

---

prove no set of facts in support of his claim which would entitle
him to relief.  <u>Id</u>., 355 U.S. at 45-46.  Under this "no set of
facts" standard, a complaint could effectively survive a motion
to dismiss so long as it contained a bare recitation of the
claim's legal elements.

111 (3d Cir. 2002); <u>Shane v. Fauver</u>, 213 F.3d 113, 117 (3d Cir. 2000).

### III.  <u>SECTION 1983 ACTIONS</u>

Wolfe brings this amended action pursuant to 42 U.S.C. § 1983.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

### IV.  <u>THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT</u>

The New Jersey SVPA, <u>N.J.S.A.</u> 30:4-27.24 *et seq.*, provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP"). <u>N.J.S.A.</u> 30:4-27.26.  The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, <u>N.J.S.A.</u> 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment.  <u>N.J.S.A.</u> 30:4-27.34(b).

10

The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in consultation with of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs. N.J.S.A. 30:4-27.25. The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed. Id. The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings. N.J.S.A. 30:4-27.35. A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge. N.J.S.A. 30:4-27.36.

11

V.   <u>ANALYSIS</u>

A.   <u>Transfer to Prison Facility Claim</u>

As in his original Complaint, Wolfe's main argument in his amended pleading appears to claim that his transfer to a prison facility, as a civilly committed person under the SVPA, is unconstitutional because he is subject to the prison policies in place for the orderly operation and security of a prison facility.

In <u>Kansas v. Hendricks</u>, 521 U.S. 346 (1997), the Supreme Court examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act called for the confinement of sexually violent predators in a secure facility because they were dangerous to the community.  <u>Id</u>., 521 U.S. at 363-64.  Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system.  However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals.  Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment.  <u>Id</u>., 521 U.S. at 363, 364, 365-368.  Thus, the Supreme Court held that involuntary confinement under Kansas' SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly

12

committed.  Id., 521 U.S. at 368-69.  See also Seling v. Young,
531 U.S. 250, 261062 (2001)(holding same with respect to the
State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the
Kansas and Washington SVP statutes that were examined and upheld
as constitutional by the Supreme Court in Hendricks and Seling,
respectively.[3]  See Bagarozy v. Goodwin, Civil Action No. 08-468
(SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re
Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002).
Therefore, this Court finds that Wolfe's placement and
confinement in a Special Treatment Unit for SVP residents that is
a segregated unit in the East Jersey State Prison, does not, in
and of itself, violate the U.S. Constitution's Due Process Clause
or the Eighth Amendment's prohibition against cruel and unusual
punishment.  Accordingly, Wolfe's claim that his continued
confinement in a segregated unit within a prison facility is
unconstitutional must be dismissed with prejudice for failure to
state a cognizable claim of a constitutional deprivation.

---

[3]  Recently, the Supreme Court held constitutional under the
Necessary and Proper Clause, a federal statute that allowed a
district court to order the civil commitment of a sexually
dangerous federal prisoner beyond the date the prisoner would
otherwise be released.  United States v. Comstock, No. 08-1224,
__ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these
civilly committed persons remained confined at a federal prison,
namely, FCI Butner, the Court did not address their place of
civil confinement as being unconstitutional.

B. <u>Conditions of Confinement Claim</u>

Although plaintiff's placement in a segregated unit within a prison facility is not, in and of itself, a constitutional violation, Wolfe makes additional allegations concerning the conditions of confinement at the EJSP facility.  For instance, he complains that he is housed in a prison facility subject to restrictions.  <u>See</u> <u>Youngberg v. Romeo</u>, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, <u>Bell v. Wolfish</u>, 441 U.S. 520, 536 (1979),[4] within the bounds of professional discretion, <u>Youngberg</u>, 457 U.S. at 321-22.  Specifically, in <u>Youngberg</u>, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties.  <u>Id</u>. at 307.  The Constitution is not concerned with <u>de</u> <u>minimis</u> restrictions on patients' liberties.  <u>Id</u>. at 320.  Moreover, "due process requires that the conditions and duration of confinement

_____

[4]  In <u>Bell v. Wolfish</u>, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

[for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." Seling, 531 U.S. at 265.  While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Wolfe's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a prison facility and has been treated like a prisoner and subjected to prison rules.  More specifically, Wolfe complains that he is housed on the South Unit with other residents who are on treatment refusal status.  These residents purportedly will receive less money each month than other residents.  Wolfe also complains that visitors are not allowed to bring cell phones, house keys and purses with them in the EJSP-STU.  Group therapy is conducted in "cages" affording little privacy from the correctional officers.  Finally, Wolfe alleges that the residents must endure cold showers, poor ventilation, bug infestation and contaminated water.

The Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme.

See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[5] to segregated confinement of civilly committed SVPs).  See also Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise extending Sandin to civil commitment settings).  Thus, Wolfe's general allegation that disruptive and agitative residents may be placed in MAP status, that he has been placed on the South Unit for treatment refusal, that his monthly pay may be reduced for treatment refusal, and that general movement is monitored and restricted, without more, fails to articulate a cognizable claim of constitutional magnitude, in light of Deavers.  Wolfe fails to allege any facts to show that MAP restrictions and movements within the EJSP facility are unduly extreme and unrelated to the purposes for which such restrictions are imposed.

Similarly, the fact that visitors at the EJSP-STU are not permitted to bring cell phones, house keys and purses on site does not state a cognizable constitutional deprivation.  The Court construes Wolfe's allegation as a First Amendment claim, in that Wolfe appears to suggest that this proscription against visitors bringing certain items onto the prison grounds might chill visitation for the residents.  A First Amendment claim such

---

[5]   In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

as this one is governed by the standard in Turner v. Safely, 482 U.S. 78, 89 (1987), which sets out the standard for challenges to regulations that restrict a prisoner's fundamental constitutional rights.

In Turner, the Supreme Court of the United States found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest.  Id. at 89.  The Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights.  Turner, 482 U.S. at 89-91.  The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.  Id.

The United States Court of Appeals for the Third Circuit has applied Turner in analyzing constitutional claims by civilly committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007

17

WL 934413 (3d Cir. March 29, 2007)(applying <u>Turner</u> in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied <u>Turner</u> when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[6]  <u>See</u> <u>Willis v. Smith</u>, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying <u>Turner</u> to SVP claims concerning mail handling procedures); <u>Ivey v. Mooney</u>, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30, 2008)(applying <u>Turner</u>, but noting that a civil confinement is significantly different from a criminal confinement); <u>Francis v. Watson</u>, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing cases that have applied <u>Turner</u> in cases involving civilly confined persons); <u>Marsh v. Liberty Behavioral Health Care, Inc.</u>, 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), <u>aff'd</u> 330 Fed. Appx. 179 (11th Cir. 2009); <u>Beaulieu v. Ludeman</u>, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).  Although the courts have not defined the contours of a civilly detained person's right to free speech, Wolfe's rights are at least co-extensive with the rights of prisoners with respect to institutional regulations that

---

[6]  Essentially, the First Amendment analysis under <u>Turner</u> mirrors the due process analysis under <u>Youngberg</u>; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside.  <u>See</u> <u>Beaulieu v. Ludeman</u>, 2008 WL 2498241, at *20 n. 15 (finding <u>Turner</u> to be consistent with <u>Youngberg</u> because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

curtail First Amendment rights.  <u>E.g.</u>, <u>City of Revere v.</u>
<u>Massachusetts Gen. Hosp.</u>, 463 U.S. 239, 244 (1983)("[T]he due
process rights of a [pretrial detainee or other persons in state
custody] are at least as great as the Eighth Amendment
protections available to a convicted prisoner").

Thus, a <u>Turner</u> analysis is applicable here despite the fact
that plaintiff is not a prisoner.  <u>See</u> <u>e.g.</u>, <u>Bell v. Wolfish</u>, 441
U.S. at 545-46 ("A detainee simply does not possess the full
range of freedoms of an unincarcerated individual" because "[t]he
fact of confinement as well as the legitimate goals and policies"
of the institution limit constitutional rights.); <u>Allison v.</u>
<u>Snyder</u>, 332 F.3d 1076, 1079 (7th Cir. 2002)(persons confined as
sexually violent "may be subjected to the ordinary conditions of
confinement").

Applying the <u>Turner</u> rule to an institutional setting such as
EJSP, institution regulations that restrict a patient's First
Amendment rights are valid if they are reasonably related to a
legitimate institutional interests, such as maintaining security,
preserving internal order and rehabilitation.  <u>McKune v. Lile</u>,
536 U.S. 24, 36 (2002) ("[R]ehabilitation is a legitimate
penological interest that must be weighed against the exercise of
an inmate's liberty."); <u>Turner</u>, 482 U.S. at 91 (rehabilitation
and maintaining security are legitimate penological interests);
<u>Allison</u>, 332 F.3d at 1079 (preventing escape and assuring safety
of others are legitimate institutional interests).

Here, this Court finds that Turner is satisfied because the EJSP STU rule prohibiting visitors from bringing cell phones, keys and purses onto the prison grounds is reasonably related to the legitimate institutional interests of security and the orderly running of the EJSP.  The EJSP STU has a legitimate interest in maintaining security of its facility by preventing the introduction of contraband onto prison property where such items may stray or mingle with the residents' property and thereafter into the general prisoner population.  See Semler v. Ludeman, 2010 WL 145275, *9-16 (D. Minn. Jan. 8, 2010) (institution rules governing media, mail, personal property, telephone access and association between patients confined as sexually violent persons are valid under Turner because they are reasonably related to legitimate security and rehabilitative interests); Spicer v. Richards, 2008 WL 3540182, *7-8 (W.D. Wash. Aug. 11, 2008)(state facility for civil detainee's "ban on the possession of electronic devices is reasonably related to the security and safety risks posed to [its] residents, staff, visitors, and the public," and therefore not violative of civil detainee's constitutional rights).

There are no restrictions on visitation, only that devices that are generally considered contraband in a prison facility should be prohibited.  Thus, plaintiff can not show a deprivation of a constitutional right.  Moreover, the rule restricting visitors from bringing contraband onto the EJSP grounds is a

cost-effective and unintrusive means to accommodate a legitimate security concern that ultimately serves to protect the staff, residents, and others.  Finally, this Court notes that Wolfe has failed to articulate any reason or alternative that would refute the apparent security need for the restriction on visitors bringing onto prison grounds anything of a contraband nature.  He simply states a legal claim that his constitutional rights will be violated without any factual support.  Such claim does not pass muster for statement of a claim under the Iqbal standard.

Facilities that house and deal with residents who have been involuntarily committed for sexual disorders are "'volatile' environments whose day-to-day operations cannot be managed from on high."  Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002).  Courts must presume that the judgment exercised by the appropriate professionals in these facilities is reasonable.  Id. (citing Youngberg v. Romeo, 457 U.S. 307, 312-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type-often, unfortunately, overcrowded and understaffed-to continue to function"); see also Hedgespeth, 2010 WL 2990897 at *9.  Accordingly, this Court finds that Wolfe has failed to state a claim of constitutional magnitude with regard to his claim that visitors can not bring cell phones, keys or purses onto EJSP grounds.

21

Finally, Wolfe alleges that he is subjected to poor living conditions, including cold showers, poor ventilation, contaminated water and bug infestation.  In particular, he claims that the drinking water is bad, and that he was told each resident would get a case of water each month, but the water goes to staff instead.  It appears that these conditions are ongoing and have not been addressed by defendants.

The lack of potable water is indeed a significant hardship and deprivation.  Thus, Wolfe's allegation, if true, would rise to the level of a constitutional violation, and the Court will allow this claim to proceed.  However, as to the other allegations of poor living conditions, this Court finds no atypical or significant deprivation that would rise to the level of a constitutional violation at this time.  Accordingly, that conditions claim will be dismissed for failure to state a claim at this time.

C.  Access to Law Library Claim

This Court next considers plaintiff's allegations that he has been denied access to the courts (via denial of access to the law library) in violation of his First and Fourteenth Amendment rights.  Courts have recognized different constitutional sources for the right of access to the courts.  Principally, the right of access derives from the First Amendment's right to petition and

the due process clauses of the Fifth and Fourteenth Amendments.[7] The right of access to the courts requires that "adequate, effective, and meaningful" access must be provided inmates who wish to challenge their criminal charge, conviction, or conditions of confinement. Bounds v. Smith, 430 U.S. 817, 822 (1977). In other words, prison officials must "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts." Id. at 825. "'[T]he touchstone ... is meaningful access to the courts.'" Peterkin v. Jeffes, 855 F.2d 1021, 1037 (3d Cir. 1988)(*quoting* Bounds, 430 U.S. at 823)(internal quotation omitted).

In Bounds, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law

---

[7] The right of access to the courts is an aspect of the First Amendment right to petition. McDonald v. Smith, 472 U.S. 479, 482 (1985); Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981). The Supreme Court also found that "[t]he constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights." Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). See also, Hudson v. Palmer, 468 U.S. 517, 523 (1984)("prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts"); Bounds v. Smith, 430 U.S. 817 (1977); Wolff v. McDonnell, 418 U.S. 539, 576 (1974). The right of access to the courts might also arise under the Sixth Amendment's right to counsel; however, under the circumstances of the present case, the Sixth Amendment clearly is not implicated.

23

libraries or adequate assistance from persons trained in the law." The right of access to the courts is not, however, unlimited. "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any <u>other</u> litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." <u>Lewis v. Casey</u>, 518 U.S. 343, 355 (1996) (emphasis in original). Similarly, a pretrial detainee has a right of access to the courts with respect to legal assistance and participation in one's own defense against pending criminal charges. <u>See</u>, <u>e.g.</u>, <u>May v. Sheahan</u>, 226 F.3d 876, 883-84 (7th Cir. 2000); <u>Caldwell v. Hall</u>, 2000 WL 343229 (E.D. Pa. March 31, 2000). <u>But see</u> <u>United States v. Byrd</u>, 208 F.3d 592, 593 (7th Cir. 2000) (pretrial detainee who rejects an offer of court-appointed counsel in satisfaction of the Sixth Amendment right to counsel has no alternative right to access to a law library); <u>Wilson v. Blankenship</u>, 163 F.3d 1284, 1290-91 (11th Cir. 1998) (same); <u>United States v. Walker</u>, 129 F.3d 1266, 1997 WL 720385, **4 (6th Cir. 1997) (same).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue such a claim or defense. <u>See</u> <u>Lewis</u>, 518 U.S. at 348-51, 354-55

(1996); <u>Oliver v. Fauver</u>, 118 F.3d 175, 177-78 (3d Cir. 1997).
"He might show, for example, that a complaint he prepared was
dismissed for failure to satisfy some technical requirement
which, because of deficiencies in the prison's legal assistance
facilities, he could not have known.  Or that he had suffered
arguably actionable harm that he wished to bring before the
courts, but was so stymied by inadequacies of the law library
that he was unable to file even a complaint."  <u>Lewis</u>, 518 U.S. at
351.

Here, Wolfe fails to allege any actual injury as a result of
the alleged denial of access to the law library.  He does not
allege that he was unable to file this or any other complaint in
the courts, and in fact, he has not been limited in filing the
instant action in this federal court.  Consequently, the
allegations in the Complaint are too conclusory to show a denial
of court access sufficient to rise to the level of a
constitutional deprivation under the <u>Iqbal</u> pleading standard.
"[T]he pleading standard Rule 8 announces does not require
detailed factual allegations, but it demands more than an
unadorned, the-defendant-unlawfully-harmed-me accusation .... Nor
does a complaint suffice if it tenders naked assertions devoid of
further factual enhancement."  <u>Iqbal</u>, 129 S.Ct. at 1949
(citations and internal quotation marks omitted).

Furthermore, Wolfe does not articulate how the alleged
denial of access to the law library has hindered his efforts to

either pursue this claim or defend himself in any pending state proceedings.  Therefore, his claim alleging denial of access to the courts based on an alleged failure to provide access to the law library will be dismissed for failure to state a claim at this time.

D.   Denial of Treatment Claim

Wolfe also appears to assert that his therapy/treatment sessions have been disrupted or denied because of the prison setting.  In particular, Wolfe alleges that there are limited on-site staff psychiatrists, that he has been placed on the South Unit at the EJSP-STU which restricts his group therapy, and that group therapy is held in cages which fails to promote privacy. This claim is construed as a claim by Wolfe that defendants have acted in violation of the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution, § 1, guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed."  Palko v. Conn., 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right

to marry.  Washington v. Glucksberg, 521 U.S. 702, 720 (1997).

Substantive due process also protects against government conduct

that is so egregious that it "shocks the conscience," even where

the conduct does not implicate any specific fundamental right.

See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny

and will be upheld if they are "narrowly tailored to serve a

compelling state interest." Reno v. Flores, 507 U.S. 292, 302

(1993).  However, regulations not implicating fundamental rights

(in other words, those claims attacking particularly egregious or

arbitrary governmental actions) are analyzed under the

deferential standard referred to as the rational basis review,

and will generally succeed only if the government action shocks

the conscience.  See Glucksberg, 521 U.S. at 728.

With respect to Wolfe's claim, it appears that he is

asserting that he has a fundamental right to adequate treatment

as a civilly committed sex offender, and that as a result of the

prison setting he is not being afforded adequate treatment.  The

Supreme Court established that there exists a constitutionally

protected right of mentally retarded persons confined at a state

institution to minimally adequate treatment.  Specifically, the

Supreme Court held that there is a constitutional right of

mentally disabled persons confined at a state institution to

"minimally adequate habilitation", self-care treatment or

training to the extent necessary to protect their recognized

fundamental rights to safety and freedom from physical restraints.  Youngberg, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated.  Youngberg, 457 U.S. at 320.  Although restrictions burdening a fundamental right generally receive strict scrutiny, in Youngberg, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions.  Id. at 322.  Consequently, the Court concluded that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."  Id. at 321 (internal quotation and citation omitted).  Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment."  Id. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that New Jersey's unique former statutory scheme for sex offenders that

28

predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of both procedural and substantive due process analyses.  288 F.3d at 545.  Leamer was not a civilly committed sex offender like plaintiff here.  Rather, Leamer was a convicted sex offender whose confinement and treatment were inextricably linked pursuant to statute.  The sentencing court had classified Leamer as having a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point.  Leamer could not reduce his sentence through good behavior credits, parole policies or other credits.  Instead, he could only shorten his incarceration through successful therapy, which was an "inherent and integral element" of the statutory scheme.  Consequently, the Third Circuit found that deprivation of treatment would be a grievous loss not emanating from the sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the violation of recognized fundamental rights to safety and freedom from physical restraints, this Court finds the Third Circuit's holding in Leamer to clearly extend to an involuntarily committed sex offender under New Jersey's SVPA.  Like Leamer, the length of Wolfe's confinement under the SVPA is predicated on his response to treatment.  Indeed, the provisions of the SVPA explicitly

recognize New Jersey's obligation to provide treatment to SVPs for their eventual release based on successful therapy.  <u>See</u> <u>N.J.S.A</u>. 30:4-27.32(a)("If the court finds by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall issue an order authorizing the involuntary commitment of the person to a facility designated for the custody, care and ***treatment*** of sexually violent predators")(emphasis added); <u>N.J.S.A</u>. 30:4-34(b)("The Division of Mental Health Services in the Department of Human Services shall provide or arrange for treatment for a person committed pursuant to this act.  Such treatment shall be appropriately tailored to address the specific needs of sexually violent predators."); <u>N.J.S.A.</u> 30:4-27.36(a)(At any time during the involuntary commitment of a person under this act, if the person's treatment team determines that the person's mental condition has so changed that the person is not likely to engage in acts of sexual violence if released, the treatment team shall recommend that the Department of Human Services authorize the person to petition the court for discharge from involuntary commitment status"); <u>see</u> <u>also</u> <u>Kansas v. Hendricks</u>, 521 U.S. 346, 367 (1997)(concluding from similarly-worded provisions of Kansas SVP Act that "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery ....")(alterations in original)(internal citations omitted).

Therefore, based on Youngberg and Leamer, this Court concludes that Wolfe may have a fundamental liberty interest in treatment, but has not stated a cognizable claim at this time for purposes of both procedural and substantive due process analyses. See Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted that Youngberg did not establish a right for the civilly committed to treatment per se; the Supreme Court only "held that the Constitution required only such 'minimally adequate training ... as may be reasonable in light of [the] liberty interest[ ] in safety and freedom from unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322). In Bailey, the Eighth Circuit concluded that plaintiff had no right to "psychiatric treatment to overcome a 'sexual offender condition'" because he "was neither in danger during his civil commitment nor was he subject to any restraints beyond the ordinary incidents of any involuntary confinement." Id. at 1153, 1154. Citing Bailey, district courts in the Eighth Circuit have since concluded that civilly committed sexual predators have no substantive due process right to mental health treatment, adequate or otherwise. See Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010)("Because this Court has not recognized a constitutional right to effective 'treatment' in the context of civilly committed sex offenders, Plaintiffs [alleging substantive due process violations through ineffective treatment] have failed to

31

allege a due process claim ....")(citing <u>Nicolaison v. Ludeman</u>,
2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in
ultimately concluding that involuntarily committed sex offender's
right to treatment is not "clearly established" for purposes of
28 U.S.C. § 2254(d)(1), that <u>Youngberg</u> "only recognized a right
to 'minimally adequate' treatment that reduces the need for
restraints," and not a "comparable right to treatment that
facilitates release")).

Indeed, based on the allegations and admissions by plaintiff
in his Complaint, Wolfe fails to show any procedural or
substantive due process violations at this time.  He does not
demonstrate a categorical denial of therapy and treatment
sessions due to the prison setting in which he receives his
treatment.  Rather, his complaints more aptly demonstrate his
personal dissatisfaction with a treatment plan and group therapy
that takes place in a prison facility.  Wolfe complains that
group therapy is held in cages, and that his preferred treatment
and group are not available to him on the South Unit.  Thus, by
plaintiff's own admission, there is no evidence that treatment is
denied or is inadequate.

In <u>Leamer</u>, the Third Circuit, relying on <u>Sandin</u>, found that
Leamer would face "significant obstacles" in establishing a
procedural due process claim based on his placement on RAP
(restricted activities program) status because the mere fact of
placement in administrative segregation is not in and of itself

enough to implicate a liberty interest.  <u>Leamer</u>, 288 F.3d at 546.

Similarly, in the instant case, although Wolfe complains that he

and other disruptive and agitative residents might be placed in

MAP status in response to their behavior, there is no indication

from the allegations here that these residents have been or will

be denied treatment.

Further, Wolfe recites legal conclusions in his complaint

about being made to feel like a "prisoner" rather than a civilly

committed person rather than allege any facts to support a claim

that he has been denied treatment.  Wolfe seems mostly fixated on

the idea of being in a "prison setting" and does not allege any

real disruption or interference with his treatment, other than

his confinement on the South Unit, which may restrict Wolfe's

access to certain groups.

This Court likewise finds no substantive due process

violation at this time.  Substantive due process prevents the

government from engaging in conduct that "shocks the conscience,"

or interferes with rights "implicit in the concept of ordered

liberty."  <u>Glucksberg</u>, 521 U.S. at 721.  Under this standard,

Defendants' actions in denying Wolfe his statutory right to

treatment will be found unconstitutional under the Fourteenth

Amendment if they were so arbitrary or egregious as to shock the

conscience.  <u>See</u> <u>Leamer</u>, 288 F.3d at 546-47 (substantive due

process claim alleging inadequate treatment for committed sex

offender "must focus on the challenged abuse of power by

officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release").

Here, as demonstrated above, defendants have not categorically declined to provide any mental health treatment to Wolfe.  Thus, this Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Wolfe's substantive due process rights.  Indeed, plaintiff's allegations, as set forth above, are merely conclusory and factually unsubstantiated.  Wolfe has not shown any disruption of treatment.  Instead, he simply objects to the manner and place in which treatment and sessions are provided.

Thus, the Court concludes that treatment has not been denied to Wolfe, as alleged because there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation as alleged.  Further, this Court concludes that the allegations asserted in Wolfe's Complaints do not show such egregious conduct or disruption as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, based on the facts as alleged in the Complaint, Wolfe's claim alleging inadequate treatment will be dismissed for failure to state a cognizable claim of a deprivation of a constitutional right.

E.  Preliminary Injunction

     Finally, Wolfe brings an application for a preliminary injunction to prevent defendants from retaliating against him by placing him in MAP or treatment refusal status for bringing this action.

     To secure the extraordinary relief of a preliminary injunction or TRO, plaintiff must demonstrate that "(1) he is likely to succeed on the merits; (2) denial will result in irreparable harm; (3) granting the injunction will not result in irreparable harm to the defendants]; and (4) granting the injunction is in the public interest." Maldonado v. Houston, 157 F.3d 179, 184 (3d Cir. 1998), cert. denied, 526 U.S. 1130 (1999)(as to a preliminary injunction); see also Ballas v. Tedesco, 41 F. Supp.2d 531, 537 (D.N.J. 1999) (as to temporary restraining order).  A plaintiff must establish that all four factors favor preliminary relief.  Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187 (3d Cir. 1990). The standards for a permanent injunction are essentially the same as for a preliminary injunction, except that the plaintiff must show actual success on the merits, not a likelihood of success, to obtain a permanent injunction.  See University of Texas v. Camenisch, 451 U.S. 390, 392 (1981).

     Here, the claims asserted in this Complaint, except the claim alleging lack of potable water, are being dismissed for failure to state a claim at this time.  Accordingly, Wolfe has not alleged facts sufficient to satisfy the first requirement

35

that he may be likely to succeed on the merits.  Moreover, Wolfe
fails to articulate irreparable harm, and thus, cannot satisfy
the second mandatory requirement.

Therefore, because Wolfe is unable to establish all four
factors necessary for preliminary injunctive relief as required,
his application for preliminary injunctive relief must be denied
at this time.

V.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint,
except the Fourteenth Amendment claim alleging lack of potable
water, will be dismissed without prejudice, for failure to state
a claim at this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).
Plaintiff's claim asserting an unconstitutional condition of
confinement in violation of his Fourteenth Amendment rights,
namely, lack of potable water, will be allowed to proceed against
the defendants at this time.  Finally, plaintiff's application
for a temporary restraining order will be denied at this time.
An appropriate order follows.


                              _s/Peter G. Sheridan_____
                              PETER G. SHERIDAN, U.S.D.J.

April 4, 2011